FILED
2023 Sep-21  AM 09:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **CHUCKIE JAMES BULLOCK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:22-cv-00287-AMM** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

Plaintiff Chuckie James Bullock brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **REVERSES** and **REMANDS** the decision of the Commissioner.

## I.    Introduction

On April 7, 2020, Mr. Bullock protectively filed an application for benefits under Title II of the Act, alleging disability as of December 18, 2015. R. 14, 125–33, 237–38. Mr. Bullock later amended his alleged onset date of disability to November 22, 2018. R. 14, 86. Mr. Bullock alleges disability due to degenerative

disc disease, bilateral knee degenerative joint disease, left wrist carpal tunnel syndrome, shoulder and rotator cuff problems, chronic hemorrhoid pain with surgery and anemia, chronic back pain with multiple pain medication changes, and hypertension. R. 20, 125. He has at least a high school education and has past relevant work experience as a welder, logger, skidder operator, supervisor (manufactured buildings), assembler (mobile home construction), and roofer. R. 23–24.

The Social Security Administration ("SSA") initially denied Mr. Bullock's application on June 12, 2020, and again upon reconsideration on August 20, 2020. R. 14, 125–33, 135–45, 154–56. On September 18, 2020, Mr. Bullock filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 14, 171–72. That request was granted. R. 179–81. Mr. Bullock received a video hearing before ALJ Mallette Richey on January 19, 2021. R. 14, 71–98. On May 11, 2021, ALJ Richey issued a decision, finding that Mr. Bullock was not disabled from November 22, 2018 through his date of last insured, September 30, 2019. R. 11–26. Mr. Bullock was forty-six years old on the date of last insured. R. 24.

Mr. Bullock appealed to the Appeals Council, which denied his request for review on January 5, 2022. R. 1–3, 8–9. After the Appeals Council denied Mr. Bullock's request for review, R. 1–3, the ALJ's decision became the final decision

of the Commissioner and subject to district court review. On March 4, 2022, Mr.

Bullock sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.    The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20

C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging

in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work

activity is work activity that involves doing significant physical or mental activities."

20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or

profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in

substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. §

404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically

determinable impairment or a combination of medical impairments that significantly

limits the claimant's ability to perform basic work activities. 20 C.F.R. §§

404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim

disability. *Id*. *Third*, the ALJ must determine whether the claimant's impairment

meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404,

Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If

such criteria are met, the claimant is declared disabled. 20 C.F.R. §

404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Mr. Bullock would meet the insured status requirements of the Act through September 30, 2019. R. 15, 17. Next, the ALJ found that Mr. Bullock "did not engage in substantial gainful activity during the period

from his alleged onset date of November 22, 2018 through his date last insured of September 30, 2019." R. 17. The ALJ decided that Mr. Bullock had the following severe impairments: reconstructive surgery of weight bearing joint; degenerative disc disease; and disorders of muscle, ligament, and fascia. R. 17. The ALJ found that Mr. Bullock's left shoulder and wrist injuries, left carpal tunnel syndrome, nephrectomy, hemorrhoids, hemorrhage, anemia, and hypertension were not severe impairments because "the medical evidence does not show any work-relate[d] limitations resulting from these impairments during the period at issue." R. 17. Overall, the ALJ determined that Mr. Bullock did not have "an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" to support a finding of disability. R. 18.

The ALJ found that Mr. Bullock's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 20. The ALJ found that Mr. Bullock had the "residual functional capacity to perform less than the full range of light work." R. 19. The ALJ determined that Mr. Bullock could: occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and/or walk with normal breaks for a total of six hours in an eight-hour workday; sit with normal breaks for a total of six hours in an eight-hour workday; frequently push and pull with the right upper extremity; occasionally climb ramps and stairs; occasionally

crouch; and frequently balance. R. 19. The ALJ prohibited: climbing ladders, ropes, and scaffolds; kneeling; crawling; all exposure to unprotected heights; and concentrated exposure to extreme cold, extreme heat, and vibrations. R. 19.

The ALJ enlisted a vocational expert to identify the past relevant work performed by Mr. Bullock. R. 23–24. The vocational expert testified that Mr. Bullock's past relevant work was that of a welder, logger, skidder operator, supervisor (manufactured buildings), assembler (mobile home construction), and roofer. R. 23–24. The ALJ determined Mr. Bullock is "unable to perform any past relevant work." R. 23.

According to the ALJ, Mr. Bullock is "a younger individual" and has "at least a high school education," as those terms are defined by the regulations. R. 24. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Mr. Bullock] is 'not disabled,' whether or not [Mr. Bullock] has transferable job skills." R. 24. Because Mr. Bullock's "ability to perform all or substantially all of the requirements of [light] work was impeded by additional limitations," the ALJ enlisted a vocational expert to ascertain whether there are a significant number of jobs in the national economy that Mr. Bullock is capable of performing. R. 25. That expert concluded that there are indeed a

significant number of such jobs in the national economy, such as a shipping weigher, airline security representative, and car-wash attendant. R. 25.

Based on these findings, the ALJ concluded that Mr. Bullock was not under a disability as defined in the Act, from November 22, 2018, through September 30, 2019, the date of last insured. R. 25–26. Mr. Bullock now challenges that decision.

## III. Factual Record

The medical records included in the transcript begin before the alleged onset date and extend beyond the date of last insured. However, the period relevant to the Commissioner's disability determination is November 22, 2018 through September 30, 2019. R. 25. Additionally, to the extent the medical records relate to medical conditions and symptoms that are not relevant to Mr. Bullock's arguments, they are not discussed.

### A. Pre-Onset Records

### Back Pain:

Mr. Bullock had back surgery in 2015 and reported that his back pain began returning months after his surgery. R. 349. Mr. Bullock presented to Dr. Mark Prevost at Southern Orthopedic & Sports Medicine on August 3, 2016 with back pain and numbness in his right leg. R. 347. Dr. Prevost diagnosed Mr. Bullock with lumbar stenosis spondylosis. R. 349. X-rays "show fairly severe degenerative changes and spondylosis with retrolisthesis of L4 and 5 and L5 and S1 [and] no

7

obvious fractures." R. 349. The "MRI scan shows a disc extrusion at L4-5 on the right [and] also significant degenerative changes and bulging disc at L5-S1[. T]his also causes some foraminal stenosis." R. 349. Dr. Prevost recommended lumbar epidural steroid injections, physical therapy, and to follow up. R. 349.

Mr. Bullock returned to Dr. Prevost on September 21, 2016. R. 351. Dr. Prevost discussed future surgical options with Mr. Bullock. R. 352. On September 23, 2016, Dr. Prevost "recommended an L4-5 decompression posterior lumbar interbody fusion posterior spinal fusion instrumentation autograft allograft Nu[C]el[]." R. 354. Mr. Bullock returned to Dr. Prevost on November 30, 2016 for a pre-surgery discussion. R. 355. Dr. Prevost performed the surgery on December 8, 2016. R. 358.

Mr. Bullock returned to Dr. Prevost on January 11, 2017. R. 360. Mr. Bullock reported that he "was doing very well and was stepping up a step and then felt something pull [and] started having terrible left side back pain." R. 361. X-rays "look[ed] good," and Dr. Prevost gave Mr. Bullock a prescription for a pain reliever. R. 361. Mr. Bullock returned to Dr. Prevost on January 23, 2017 and complained of back and left leg pain. R. 363. Mr. Bullock's X-rays were "normal," and Dr. Prevost prescribed a pain reliever. R. 363. Mr. Bullock returned to Dr. Prevost on March 20, 2017 to follow up after his lumbar decompression fusion. R. 365. Mr. Bullock stated his pain was a 6 or 7 out of 10, and Dr. Bullock took X-rays which showed Mr.

Bullock's "fusion at L4-5 . . . appears to be fusing up nicely [with] no evidence of loosening of the hardware [but] he does have diffuse degenerative changes throughout the lumbar spine." R. 365. Dr. Prevost refilled Mr. Bullock's pain medication. R. 365. Mr. Bullock returned to Dr. Prevost on December 4, 2017 after experiencing back and leg pain after "turn[ing] over in the bed in a jerking movement." R. 369. X-rays and a CT scan showed "obvious pseudoarthrosis at L4-5" and "diffuse degenerative changes throughout the lumbar spine." R. 369. Mr. Bullock underwent an MRI of his lumbar spine on December 5, 2017 that revealed post-operative and degenerative changes. R. 371. Mr. Bullock returned to Dr. Prevost on December 11, 2017 to discuss the MRI findings. R. 373. Dr. Prevost recommended surgery to remove the hardware, evaluate the fusion, and perform an "L4-5 posterior spinal fusion autograft allograft Nu[C]el[]." R. 374, 376.

Dr. Prevost performed surgery on January 16, 2018. R. 378. After the surgery, Mr. Bullock was prescribed physical therapy. R. 392–93.

Mr. Bullock presented to the emergency room at Russellville Hospital on July 9, 2018 with complaints of back pain. R. 986. On July 28, 2018 and July 29, 2018, Mr. Bullock again presented to the emergency room at Russellville Hospital with complaints of back pain. R. 995, 1009.

A July 28, 2018 radiology report of the lumbar spine from Russellville Hospital found: "Vertebral heights alignment are normal. There are postoperative

changes at L4-L5 with disc spacer in place. Suspected laminectomy at L4 and L5. No subluxation. Interpedicular distance is normal." R. 430. The impression was: "Postoperative changes at L4-L5. No acute-appearing abnormality." R. 430. A July 28, 2018 radiology report of the sacrum and coccyx from Russellville Hospital found: "There is no fracture. Sacrococcygeal alignment is normal. There is a displaced or L4-L5 (sic). SI joints are symmetric. Symphysis pubis is normal. Hips are normally located." R. 431. The impression was: "No diagnostic abnormality." R. 431.

Mr. Bullock returned to Dr. Prevost on August 6, 2018 for a lumbar spine evaluation after experiencing back and lower extremity pain after feeling a "pop in his lower back." R. 382. X-rays showed Mr. Bullock's "previous fusion [at] L4-5" and "fairly severe degenerative changes throughout the lumbar spine [and] no obvious fractures." R. 382. Dr. Prevost recommended an MRI of the lumbar spine, which was performed on August 7, 2018. R. 383–84. The MRI showed post-operative and degenerative changes; removal of the L4 and L5 pedicle screws; and shallow posterior disc bulging at L3-L4 that is mildly increased on the left with very mild narrowing of the left lateral recess. R. 385. Mr. Bullock returned to Dr. Prevost on August 8, 2018 to discuss his MRI. R. 387. Dr. Prevost wrote that the "MRI scan . . . shows fairly severe degenerative changes all the way up and down his lumbar spine [and] his postsurgical changes at L4-5[. H]e does have some mild narrowing

at L4-5[,] L5-S1 stenosis[,] and significant endplate signal changes at multiple levels throughout the lumbar spine. Fairly severe spondylosis for his age." R. 387. Dr. Prevost recommended pain management, did not recommend more surgery, and referred Mr. Bullock to pain management. R. 387.

Dr. Lloyd Dyas treated Mr. Bullock for chronic pain management. *See* R. 443. On August 27, 2018, Mr. Bullock reported that his January 2018 back surgery was "not effective in eliminating pain or impairment" and he continued "to suffer from chronic back [pa]in and impairment." R. 455. On October 22, 2018, Mr. Bullock reported "coping well with current pain management" and wished to continue. R. 457. However, he continued to have pain and impairment. R. 459.

**Knee Pain:**

Mr. Bullock returned to Dr. Dyas on September 6, 2017, and Dr. Dyas performed a corticosteroid injection on Mr. Bullock's right knee. R. 913. Mr. Bullock returned to Dr. Dyas on October 2, 2017 for an evaluation of his right knee. R. 916. Dr. Dyas recommended "right knee arthroscopy with arthroscopic debridement." R. 919.

Dr. Dyas performed a right knee arthroscopy on October 10, 2017. R. 397. Mr. Bullock presented to Dr. Dyas on October 23, 2017 for a postoperative visit. R. 924. Mr. Bullock presented to Dr. Dyas on January 10, 2018 for a three-month follow-up appointment after his right knee arthroscopy. R. 394. While cold weather

11

bothered him, Mr. Bullock reported that he was "pleased with the results of the surgery" and did not "report[] new orthopedic symptoms." R. 394. Dr. Dyas prescribed pain medication and "recommended continued conservative therapy." R. 396. Mr. Bullock returned to Dr. Dyas on March 7, 2018 for an 8-week recheck. R. 397. Mr. Bullock reported that his right knee "is doing well but still bothers him quite a lot" and that "the left knee is now bothering him almost as much as the right one was now." R. 397. Mr. Bullock returned to Dr. Dyas on May 2, 2018 for an 8-week recheck. R. 402. Mr. Bullock stated that his right knee "is doing well but still bothers him quite a lot," his right knee "is a lot better than it was before his surgery," and his "left knee is still bothering him today." R. 402. Mr. Bullock stated that he wanted to continue "with [his] current pain management" was "ready to proceed with left knee arthroscopy and arthroscopic debridement." R. 402, 404. Dr. Dyas performed Mr. Bullock's left knee arthroscopy with microfracture technique and abrasion chondroplasty of the patellofemoral joint on May 11, 2018. R. 406, 686.

Mr. Bullock returned to Dr. Dyas for his first postoperative visit on May 21, 2018. R. 415. Dr. Dyas ordered physical therapy. R. 416. On May 30, 2018, Mr. Bullock underwent an X-ray at the request of his physical therapist after he reported that his left knee buckled when he was going down steps. R. 417. Mr. Bullock reported that he could not bear weight on his left leg and was in terrible pain. R. 417. The X-ray "revealed no fracture or dislocation." R. 418. Mr. Bullock returned to Dr.

Dyas on June 6, 2018 to review lab work that showed no evidence of infection. R. 425, 427. Mr. Bullock returned to Dr. Dyas on July 16, 2018, and he stated that his left knee "is doing a lot better and he is pleased with the results of the surgery." R. 428. Mr. Bullock was discharged from physical therapy on August 9, 2018 for non-compliance. R. 442.

Mr. Bullock returned to Dr. Dyas on August 13, 2018 and reported that his left knee "still bothers him some but it [is] a lot better than it was before his surgery." R. 443.

**Shoulder Pain:**

Mr. Bullock reported to Dr. Dyas on July 26, 2017 for a left shoulder injury. R. 905. Dr. Dyas performed a corticosteroid injection in Mr. Bullock's shoulder. R. 906. On August 9, 2017, Mr. Bullock reported that the injection helped with the shoulder pain. R. 907. An August 9, 2017 X-ray of the left shoulder "revealed no evidence of dislocation, type II acromion, narrowing of the AC joint." R. 909.

Mr. Bullock returned to Dr. Dyas on September 6, 2017, and Dr. Dyas performed a corticosteroid injection. R. 913. Mr. Bullock returned to Dr. Dyas on October 2, 2017 for an evaluation of his left shoulder. R. 916.

Mr. Bullock underwent a left nephrectomy, but he reported experiencing left shoulder pain at his May 2, 2018 appointment with Dr. Dyas. R. 404. The orthopedic examination revealed "signs and symptoms of impingement with pain above

shoulder height, positional night pain, [and] pain with any range of motion of the shou[ld]er." R. 404. Mr. Bullock dislocated his left shoulder in July 2018 and was treated at the emergency room. R. 429.

Dr. Dyas performed left shoulder X-rays on August 13, 2018, when Mr. Bullock reported that his left shoulder dislocated easily and was very painful. R. 443. Mr. Bullock underwent an MRI of his left shoulder on August 23, 2018. R. 447. The impression was: "Intrasubstance tear of the supraspinatus tendon at its attachment to greater tuberosity. Subchondral cyst formation near the greater tuberosity and possibly related to the site of impaction if and when the patient had an anterior dislocation." R. 447. On August 27, 2018, Dr. Dyas reviewed the results of this MRI with Mr. Bullock and recommended a consultation for an "arthroscopy anterior labral reconstruction with reconstruction of the inferior glenohumeral ligament and rotator cuff repair if indicated." R. 455.

Dr. Cantrell performed a left shoulder arthroscopy with labral repair and capsular shift on September 20, 2018. R. 457. On September 28, 2018, Mr. Bullock presented to Dr. Cantrell for follow up. R. 1085. An X-ray showed "no acute bone or joint pathology. The glenohumeral joint is reduced." R. 1085. On October 15, 2018, Mr. Bullock presented to Dr. Cantrell for a postoperative follow up, and Mr. Bullock complained of postoperative injuries and pain. R. 1083.

**Wrist Pain:**

On March 4, 2017, Mr. Bullock was diagnosed with a "[c]omminuted fracture of the distal radius [of the left wrist] with only minimal displacement of fragments. Avulsion fracture of the ulnar styloid." R. 851. Mr. Bullock saw Dr. Dyas on March 6, 2017 for this injury, and Dr. Dyas advised Mr. Bullock to proceed with emergency surgery "to decompress both compartments." R. 861–62. Surgery was performed on March 6, 2017. R. 863. Mr. Bullock returned to Dr. Dyas on March 13, 2017 and March 20, 2017 for postoperative visits. R. 867, 869. Mr. Bullock fell in the shower on March 31, 2017 and reinjured his left wrist, and he returned to Dr. Dyas on April 3, 2017. R. 872–73. "Xray revealed there is a new fracture line across the distal radius, no displacement. It appears the plate has 'held'." R. 873. Dr. Dyas prescribed additional pain medication. R. 873.

Mr. Bullock returned to Dr. Dyas on April 10, 2017 with worsening wrist pain. R. 874–75. Dr. Dyas's examination revealed that Mr. Bullock "now has a dense carpal tunnel syndrome with neuropathy of the medial nerve, since his second fall." R. 875. Dr. Dyas referred Mr. Bullock to an upper extremity specialist, prescribed pain medication, and advised him to return in one week. R. 875. On April 26, 2017, Mr. Bullock returned to Dr. Dyas after receiving a second opinion. R. 882. Dr. Dyas performed a left carpal tunnel decompression on May 5, 2017. R. 884. Mr. Bullock returned to Dr. Dyas on May 15, 2017 for a postoperative visit. R. 889. Mr. Bullock returned to Dr. Dyas on June 12, 2017 for a postoperative visit. R. 891. He reported

"doing better," with "some pain" with overuse, and that he "has returned to work." R. 891.

Mr. Bullock returned to Dr. Dyas on June 28, 2017 after falling on his left hand. R. 900. Dr. Dyas opined that a CT scan was indicated and prescribed Mr. Bullock additional pain medication. R. 901. Mr. Bullock returned on July 10, 2017 to discuss the CT scan results. R. 903. The CT scan revealed "no scaphoid fracture." R. 904.

Mr. Bullock returned to Dr. Dyas on August 9, 2017, and Dr. Dyas took two X-rays of his left wrist. R. 907. The X-rays "revealed no new fracture or dislocation. He has good position and alignment of the original fracture ORIF, good position of the hardware." R. 909.

## B. Disability Onset Date Through Date of Last Insured Records

Mr. Bullock presented to Dr. Dyas for a recheck for chronic pain management on December 20, 2018. R. 461. Mr. Bullock reported "coping well with current pain management" for "chronic low back pain with lumbar paraspinal muscle spasm, right sciatica, lumbar postlaminectomy syndrome, left sciatica, lumbar spinal stenosis, left knee pain with left knee arthralgia, left knee chondromalacia patella[,] and left . . . shoulder pain." R. 461. Mr. Bullock stated that Dr. Cantrell had recommended another shoulder surgery for his left rotator cuff, but Mr. Bullock had declined for now and "wishes to continue current pain management." R. 461. Mr.

Bullock had an antalgic gait. R. 463. Dr. Dyas wrote that Mr. Bullock "continues to suffer from chronic pain with pain generators well documented in the chart," and that his January 2018 back surgery was "not effective." R. 463. Dr. Dyas wrote that Mr. Bullock "continues to have pain, impairment, muscle spasm[,] and stiffness" and "has pain at rest." R. 463. The examination notes state: "Examination of the lumbar spine revealed diminished range of motion. Paraspinal muscle spasm. Tenderness of the right SI joint. Straight leg raising is positive on the right. Reflex, motor[,] and sensory examination is normal." R. 463.

Mr. Bullock returned to Dr. Dyas on February 13, 2019 for "chronic low back pain with bilateral sciatica, lumbar postlaminectomy syndrome, lumbar spinal stenosis, bilateral knee pain with left knee arthralgia[,] and left shoulder pain." R. 465. Mr. Bullock was "coping well with current pain management," did not report "new or worsening orthopedic symptoms," and "wishes to continue current pain management." R. 465. Mr. Bullock had an antalgic gait. R. 467. Dr. Dyas wrote that Mr. Bullock "continues to suffer from chronic pain[ with] pain generators well documented in the chart." R. 467. Dr. Dyas wrote that Mr. Bullock "continues to have pain, impairment, muscle spasm, stiffness[,] and pain at rest." R. 467. The examination notes state: "Examination revealed diminished range of motion of the lumbar spine, paraspinal muscle spasm. Tenderness of both SI joints. Straight leg

raising is positive on the right. Reflex, motor[,] and sensory examination is normal."
R. 467. Mr. Bullock was treated with injections to both SI joints. R. 468.

Mr. Bullock returned to Dr. Dyas on March 6, 2019 for "worsening left knee pain." R. 469. Mr. Bullock reported that it was "terribly painful to just press the clutch on his vehicle." R. 469. Mr. Bullock had an antalgic gait. R. 471. Dr. Dyas wrote that while Mr. Bullock "initially did well" following arthroscopic surgery, "he had a flare up so that he can not even push the clutch on his tractor." R. 471. Dr. Dyas also noted that his January 2018 spinal surgery was "not effective," and Dr. Prevost told Mr. Bullock in January 2019 that "there was nothing else to offer him in this regard." R. 471. The examination notes state: "Examination of the lumbar spine revealed paraspinal muscle spasm, tenderness of both SI joints. Straight leg raising is positive on the right. Reflex, motor[,] and sensory testing normal. Examination of the left knee revealed 10 degree flexion contracture. Positive hyperflexion test. No laixty. 2+ effusion. He has severe pain behavior associated with manipulation of the patella associated with crepitation of the patella." R. 471–72. X-rays of the left knee "were consistent with patella femoral [osteoarthritis]." R. 472. Mr. Bullock was given a left knee injection and prescribed an additional topical medication for his knee. R. 472.

Mr. Bullock returned to Dr. Dyas on April 10, 2019 for "chronic low back pain with bilateral sciatica, lumbar spinal stenosis, lumbar postlaminectomy

syndrome, lumbar paraspinal muscle spasm, chronic bilateral knee pain with left knee chondromalacia patella, left knee arthralgia[,] and left shoulder pain." R. 474. Mr. Bullock was "coping well with current pain management," did not report "new orthopedic symptoms," and "wishes to continue current pain management." R. 474. Mr. Bullock had an antalgic gait. R. 476. Dr. Dyas treated Mr. Bullock with injections to his left knee and SI joint and continued opiate pain management. R. 476–77.

Mr. Bullock returned to Dr. Dyas on May 31, 2019 for "bilateral knee injections and SI injections." R. 478. Mr. Bullock was "under chronic pain management for chronic low back pain with lumbar degenerative disc disease, bilateral sciatica, lumbar canal stenosis, lumbar postlaminectomy syndrome[,] and chronic bilateral knee pain." R. 478. Mr. Bullock reported that "his lower back and both his knees continue to really bother him," and that "[h]e was bailing hay and . . . just pushing the pedals on his tractor is painful for his knees and lower back." R. 478. Mr. Bullock had an antalgic gait. R. 480. The examination notes state: "Examination revealed diminished range of motion of the lumbar spine, paraspinal muscle spasm. Straight leg raising is positive on the right. Reflex, motor[,] and sensory testing normal with L5-S1 radicular de[r]motomal pattern. Examination of both knees revealed consistent with diagnosis of patella femoral [osteoarthritis] with patella femoral crepitation and pain with manipulation of the patella. Positive

hyperflexion test. No ligamentous laxity. Tenderness of the medial compartment bilaterally." R. 480–81. Dr. Dyas "recommended conservative therapy." R. 481. Mr. Bullock was given injections to both knees and both SI joints. R. 481.

Mr. Bullock returned to Dr. Dyas on July 16, 2019 for chronic pain management for "chronic low back pain with bilateral sciatica, lumbar postlaminectomy syndrome, lumbar canal stenosis, chronic bilateral knee pain with bilateral knee primary osteoarthritis[,] and chronic left shoulder pain." R. 493. Mr. Bullock reported "coping well with current pain management" and desired to "continue current pain management." R. 493.

On August 1, 2019, Mr. Bullock underwent arthroscopy of the left knee with abrasion chondroplasty of the medial femoral condyle and corticosteroid injection. R. 485. In his History and Physical Report, Dr. Dyas wrote that despite conservative treatment, Mr. Bullock's symptoms persist; that he "has pain working with the clutch on his tractor," "getting up and down stairs, getting in and out of a car"; and that "[h]e has catching, locking, giving way, even pain at rest." R. 487. Mr. Bullock returned to Dr. Dyas on August 12, 2019 for a postoperative visit. R. 491.

### C. Post-Date of Last Insured Records

Mr. Bullock returned to Dr. Dyas on October 7, 2019 for a postoperative visit. R. 771. He reported that his left knee was "doing really well and he [wa]s pleased with the results of the surgery." R. 771. At the visit, he stated he was "ready to

proceed with right knee arthroscopic surgery." R. 772. With respect to Mr. Bullock's back pain, Dr. Dyas's impression and plan stated: "He continues to benefit with opiate pain management from point of view of failed lumbar back surgery. He has severe paraspinal muscle spasm, restriction of range of motion[,] and neuropathic pain of both lower extremities. I have injected both SI joints . . . . No other nonoperative treatment has been effective." R. 772.

Mr. Bullock underwent a right knee arthroscopy with debridement on November 5, 2019. R. 778. Mr. Bullock returned to Dr. Dyas on November 15, 2019 for a postoperative visit. R. 780. Mr. Bullock returned to Dr. Dyas on January 13, 2020 for a postoperative visit. R. 782. Dr. Dyas performed SI joint injections "for treatment of low back pain, muscle spasm[,] and sacroiliitis." R. 784.

A February 5, 2020 CT scan of Mr. Bullock's abdomen and pelvis showed "[p]ostoperative and degenerative changes in the lumbar spine." R. 650.

Mr. Bullock presented to Russellville Hospital on February 23, 2020 with a wrist injury sustained during a fall. R. 620. He was diagnosed with a sprain of the carpal joint of his left wrist. R. 622. An X-ray identified "[n]o acute fracture." R. 658. Mr. Bullock was evaluated by Dr. Dyas on February 26, 2020. R. 785. Dr. Dyas diagnosed "a severe sprain and contusion of the left wrist." R. 787.

Mr. Bullock presented to Dr. Dyas on March 11, 2020 for chronic pain management "with lumbar degenerative disc disease and bilateral knee pain." R.

788. Mr. Bullock stated that his right knee was still bothering him, he did not get much benefit from the surgery, and he wanted to discuss "total knee arthroplasty." R. 788. At the visit, Mr. Bullock received an injection to his left shoulder. R. 790. Pre- and post-operative imaging of Mr. Bullock's knees was obtained in March 2020. R. 654–57. Dr. Dyas performed a "[r]ight total knee arthroplasty" on March 19, 2020. R. 804.

Mr. Bullock returned to Dr. Dyas on April 1, 2020 for a postoperative visit. R. 814. Mr. Bullock returned to Dr. Dyas on April 8, 2020 for a postoperative visit. R. 817.

Mr. Bullock presented to Dr. Dyas on May 1, 2020 for SI injections. R. 819. Mr. Bullock reported "worsening pain in his right lower back and right hip." R. 819. Mr. Bullock presented to Dr. Dyas on May 29, 2020 for a postoperative visit following his right total knee arthroplasty. R. 1184. Mr. Bullock reported "that his right knee is getting better every day" and that he was "attending physical therapy" and "his flexion and extension are improving." R. 1184. Mr. Bullock was still experiencing "some swelling in the knee and pain but it was different than it was before the surgery." R. 1184. Mr. Bullock reported that he was "pleased with the results of his surgery" and that the bilateral SI injections "really benefitted him" and he would like to repeat them. R. 1184.

Mr. Bullock fell on August 13, 2020 and injured his lower back and tweaked his right knee. R. 1235. He reported to the emergency room. R. 1246. Mr. Bullock presented to Dr. Dyas on August 17, 2020 for a recheck for chronic pain management and as a follow up after his back injury. R. 1246. A CT scan performed in the hospital "revealed no acute bony abnormality post surgical changes at L4-5 with prior laminectomy and intervertebral disc spacer at this level. There is multiple level DDD with narrowing of the lumbar spine at multiple levels." R. 1249. Dr. Dyas recommend conservative therapy and ordered physical therapy and injections to the SI joint. R. 1249. Mr. Bullock presented to Dr. Dyas on September 14, 2020, and X-rays were taken of his right knee. R. 1235. Dr. Dyas recommended that Mr. Bullock continue physical therapy and performed SI joint injections. R. 1237–38.

Physical therapy treatment notes from August 2020, September 2020, and October 2020 indicate Mr. Bullock reported he was experiencing lower back pain, stiffness, and muscle spasms. R. 1227–34, 1240–45, 1303–05.

Mr. Bullock presented to Dr. Dyas on November 9, 2020 for a recheck for chronic pain management. R. 1296. At that visit, Mr. Bullock received SI joint injections. R. 1299. Mr. Bullock presented to Dr. Dyas on November 18, 2020 to discuss left knee surgery. R. 1293.

Dr. Dyas performed a left knee arthroscopy with abrasion chondroplasty of the patellofemoral joint on December 8, 2020. R. 35, 1270, 1273. Mr. Bullock

presented to Dr. Dyas on December 18, 2020 for a postoperative follow-up appointment. R. 1270. Mr. Bullock presented to Dr. Dyas on February 12, 2021 for a postoperative follow-up appointment. R. 35. At the visit, Mr. Bullock reported his knee was "doing about the same," "he has not realized the benefit from the surgery," and "his knee cap continues to 'catch.'" R. 35. Dr. Dyas discussed treatment options, and Mr. Bullock indicated that he "would like to proceed with left total knee arthroplasty in the future." R. 36.

Dr. Dyas diagnosed Mr. Bullock with "end-stage osteoarthritis of the left knee, predominantly the patellofemoral joint." R. 52. Dr. Dyas noted that Mr. Bullock had "failed in conservative therapy including abrasion chondroplasty of the patellofemoral joint and physical therapy." R. 52. Dr. Dyas also noted that Mr. Bullock "continues to have pain and swelling and impairment of the left knee," "cannot walk beyond thickened activities of daily living," "has pain getting in and out of a chair," "is not able to crouch, crawl[,] or kneel," "cannot climb stairs but [one] at a time," and his symptoms persist despite undergoing "previous corticosteroid injections, anti-inflammatory medication, avoidance of aggravating activity, and symptomatic modalities in the form of physical therapy." R. 52.

Mr. Bullock returned to Dr. Dyas on March 1, 2021 for a postoperative follow up appointment. R. 58. X-rays confirmed the diagnosis of end stage osteoarthritis. R. 59.

On March 25, 2021, Dr. Dyas performed a left total knee arthroplasty. R. 50. Mr. Bullock was seen by Dr. Dyas on March 31, 2021 "as an emergency." R. 60. Mr. Bullock had "ecchymosis involving almost the entire thigh anterior and posterior" and swelling. R. 60.

Mr. Bullock returned to Dr. Dyas for a postoperative follow-up appointment following the left total knee arthroplasty. R. 63. At the time, Mr. Bullock reported that his left knee was improving and he had begun physical therapy, though he had a lot of bruising. R.63.

## IV.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the Appeal Council's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence.

*See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## V.    Discussion

Mr. Bullock alleges that the Appeals Council's decision should be reversed and remanded because: the "ALJ erred in failing to recognize all of [Mr.] Bullock's impairments as severe and his ongoing chronic pain, as required by SSA rules" and the "ALJ failed to consider [Mr.] Bullock's testimony of the need for rest breaks." Doc. 13 at 11, 18. Mr. Bullock also alleges that the ALJ mischaracterized the

documentary evidence and improperly discredited Mr. Bullock's testimony when identifying severe impairments and formulating his residual functional capacity. *See id.* at 13–18.

The second step of the sequential disability evaluation requires the ALJ to consider the combined severity of the claimant's medically determinable physical and mental impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable impairment is severe if it significantly limits a claimant's physical or mental abilities to do basic work activities and lasts at least twelve months. *See* 20 C.F.R. § 404.1520(c)–(d). If a claimant does "not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . , or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled." 20 C.F.R. § 404.1520(a)(4)(ii). "The finding of any severe impairment . . . is enough to satisfy step two because once the ALJ proceeds beyond step two, he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." *Burgin v. Comm'r*, 420 F. App'x 901, 902 (11th Cir. 2011). "Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe." *Heatly v. Comm'r*, 382 F. App'x 823, 824–25 (11th Cir. 2010) (stating "all that step two requires" is that the ALJ concluded the claimant "had a severe impairment").

Social Security Ruling 96-8p ("SSR 96-8p") regulates the ALJ's assessment of a claimant's residual functional capacity. Under SSR 96-8p, the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p at *1, 1996 WL 374184 (July 2, 1996). The ruling specifically mandates a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's residual functional capacity must: "Contain a thorough discussion and analysis of the objective medical and other evidence . . . ; Include a resolution of any inconsistencies in the evidence as a whole; and Set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work." *Id.*

The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in his findings with respect to a claimant's "functional limitations and work-related abilities on a function-by-function basis," those findings nonetheless satisfy the requirements of SSR 96-8p if the ALJ considered all of the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009) (an

ALJ's finding is sufficiently detailed despite lacking an express discussion of every function if there is substantial evidence supporting the ALJ's residual functional capacity assessment). In addition, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to allow the court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. § 404.1529(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 404.1529(a), (b); Social Security Ruling 16-3p, 2017 WL 5180304, at *3–*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on his ability to work. *See* 20 C.F.R. § 404.1529(c); *Wilson*, 284 F.3d at 1225–26. In evaluating the extent to which a claimant's symptoms affect his capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. § 404.1529(c)(3), (4); SSR 16-3p at *4, *7–*8. To discredit a claimant's statements, the ALJ must clearly "articulate explicit and adequate reasons." *See Dyer*, 395 F.3d at 1210.

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in her decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.*

A determination under the pain standard is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial

evidence. *See Hand v. Heckler*, 761 F.2d 1545, 1548–49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). The Eleventh Circuit will not disturb a clearly articulated finding supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D.F.L. 1996) (holding that the ALJ's failure to articulate adequate reasons for only partially crediting the plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Mr. Bullock asserts that the ALJ "failed to consider residual pain he had prior to November 22, 2018, or conditions treated in 2020 and 2021 that had been diagnosed before his" date of last insured and failed to "properly consider [Mr.] Bullock's severe left shoulder and knee problems." Doc. 13 at 11. Mr. Bullock also argues that the ALJ improperly applied the pain standard because her "reasons for discounting [Mr.] Bullock's testimony" are not supported by the evidence she cites. *Id.* at 15. The Commissioner argues that the "ALJ's thorough discussion of the

evidence provides substantial evidence supporting her [residual functional capacity] assessment and symptom evaluation determination." Doc. 14 at 7.

As an initial matter, the ALJ identified Mr. Bullock's reconstructive surgery of weight bearing joint; degenerative disc disease; and disorders of muscle, ligament, and fascia as severe impairments. R. 17. Therefore, the ALJ satisfied step two of the sequential disability analysis.

With respect to his residual functional capacity, Mr. Bullock argues that if "[p]roperly considered" the documentary evidence "limits [Mr.] Bullock to standing and walking at a *sedentary* level, rather than at the light level." Doc. 13 at 14. Additionally, Mr. Bullock argues that the residual functional capacity ignores his chronic pain. *Id.*

After step three in the sequential evaluation, the ALJ carefully considered the "entire record" when forming Mr. Bullock's residual functional capacity. R. 19. The ALJ stated that she found that, through the date of last insured (September 30, 2019), Mr. Bullock had the residual functional capacity to:

> perform less than the full range of light work as defined in 20 CFR 404.1567(b). [Mr. Bullock] could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk with normal breaks for a total of six hours in an eight-hour workday, and sit with normal breaks for a total of six hours in an eight-hour workday. [Mr. Bullock] could frequently push and pull with the right upper extremity, occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, never kneel, occasionally crouch, and never crawl. [Mr. Bullock]

> should avoid all exposure to unprotected heights. [Mr. Bullock] could frequently balance. [Mr. Bullock] should avoid concentrated exposure to extreme cold, extreme heat, and vibrations.

R. 19. The ALJ summarized Mr. Bullock's hearing testimony and the medical evidence of record. R. 19–22. Then the ALJ fully considered the medical opinions and prior administrative medical findings of Dr. Krishna Reddy and Dr. Victoria Hogan. R. 23.

With respect to Mr. Bullock's physical limitations, the ALJ concluded:

> Importantly, although the medical evidence of record supports some limitations resulting from [Mr. Bullock's] impairments, the objective examinations, medical imaging, and other diagnostic techniques usually show only mild or moderate abnormalities with many normal findings during the period at issue. Insofar as the medical evidence at times shows significant findings, the undersigned assessed corresponding limitations in [Mr. Bullock's] residual functional capacity . . . , which includes many substantial restrictions. However, the objective medical evidence does not show the severity of findings to support greater limitations during the period at issue. Therefore, the undersigned finds that the medical records support no greater limitations than the limitations listed . . . in the [residual functional capacity].

R. 21. The ALJ also stated:

> In sum, the medical records show a long history of orthopedic impairments at the back and knees with multiple surgeries, but the records indicate that [Mr. Bullock] recovered well. . . . The records also show that [Mr. Bullock] usually reported doing well with his pain management routine. Furthermore, [Mr. Bullock] reported significant activities, including bailing hay and using a

> tractor. Accordingly, the evidence of record as a whole
> supports no greater limitations during the period at issue.
> After the date of last insured, the medical records show
> some worsening that is more consistent with [Mr.
> Bullock's] testimony, but the allegations are inconsistent
> with the medical evidence during the period at issue.

R. 22.

After delineating the pain standard, the ALJ stated that Mr. Bullock's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but Mr. Bullock's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 20. When describing Mr. Bullock's symptoms, the ALJ wrote:

> At his hearing, [Mr. Bullock] alleged that he could not
> work primarily due to back pain with radicular symptoms
> in the lower extremities. He testified that he has
> degenerative disc disease with multiple surgeries, he has
> nerve problems in the legs with limited mobility, he falls
> frequently, and he changes positions throughout the day.
> [Mr. Bullock] stated that he could be on his feet 15–20
> minutes at a time, he could sit 20–30 minutes at a time,
> and he lies down for most of the day. He also alleged
> arthritis and pain in the knees with a right knee
> replacement in March 2020 and a planned left knee
> replacement in February 2021, he has a history of left knee
> arthroscopy, he has difficulty bending the knees, and he
> could not squat or bend down. [Mr. Bullock] testified the
> pain affects concentration, such that he could only sustain
> concentration for one hour at a time. He also stated that he
> could not sustain work for eight hours per day and five
> days per week, and he must go to the doctor two to three
> times per month. [Mr. Bullock] alleged left shoulder and

> wrist impairments. He testified that he had one kidney
> removed, he has pain, he must be careful with
> medications, he has nausea, and he has a history of
> hospitalizations for kidney issues requiring
> catheterization, although he has no hospitalizations for
> kidney issues since the amended alleged onset date. [Mr.
> Bullock] stated that he had a hospitalization associated
> with a March 2020 surgery complicated by hemorrhage
> requiring blood transfusion.

R. 20.

Along with her consideration of the record medical evidence during the

relevant time period and hearing testimony, the ALJ considered Mr. Bullock's daily

activities when making her credibility determination. R. 22. The ALJ described her

assessment of Mr. Bullock's daily activities as follows:

> Furthermore, on May 31, 2019, [Mr. Bullock] reported
> that he was bailing hay and using a tractor. These activities
> contradict the severity of limitations alleged by [Mr.
> Bullock], and they generally support the ability to perform
> work activities within the above [residual functional
> capacity].

R. 22 (citations omitted).

Because the ALJ's rationale reflects a selective reading of the record and does

not adequately support her ultimate conclusions, *see Jenson v. Comm'r*, No. 21-

13324, 2022 WL 2663585, at *3 (11th Cir. July 11, 2022), the court concludes that

the ALJ's decision is not supported by substantial evidence.

The ALJ based her decision on a finding that "the objective examinations,

medical imaging, and other diagnostic techniques usually show only mild to

moderate abnormalities with many normal findings during the period at issue." R. 21. But the ALJ failed to reconcile this statement with contrary evidence – or even address some of that evidence.

With respect to Mr. Bullock's "degenerative disc disease with back pain and radicular symptoms in the lower extremities," the ALJ stated that while Mr. Bullock's symptoms "began several years before the period at issue," he "recovered from [two lumbar fusions] before the alleged onset date." R. 21. In making this statement, the ALJ ignored Dr. Dyas's repeated statements during the period at issue that Mr. Bullock's lumbar fusions were "failed" surgeries, he was undergoing opioid therapy, and continued to experience symptoms upon examination. R. 463 ("back surgery . . . was not effective"); R. 463 ("diminished range of motion" of lumbar spine, "[p]araspinal muscle spasm[,]" "[t]enderness of the right SI joint[,]" and "[s]traight leg raising is positive on the right"); R. 467 ("back surgery . . . was not effective"); R. 467 ("diminished range of motion of the lumbar spine, paraspinal muscle spasm[,]" "[t]enderness of both SI joints[,]" and "[s]traight leg raising is positive on the right"); R. 471 (January 2018 spinal surgery was "not effective" and back surgeon had "nothing else to offer him in this regard"); R. 471–72 ("paraspinal muscle spasm, tenderness of both SI joints[,] [s]traight leg raising is positive on the right"); R. 480–81 ("diminished range of motion of the lumbar spine, paraspinal

muscle spasm[, s]traight leg raising positive on the right[,]" and "L5-S1 radicular de[r]motomal pattern").

The ALJ failed to reconcile the evidence that Mr. Bullock's previous back surgeries were not effective with her finding that Mr. Bullock "recovered from the surgeries before the alleged onset date." R. 21. Indeed, the ALJ did not even address this evidence.

Furthermore, the ALJ's description of Mr. Bullock's August 2018 MRI was incomplete and inaccurate. The ALJ stated: "A follow-up MRI of the lumbar spine in August 2018 showed only mild to moderate degenerative changes." R. 21 (citation omitted). Although the MRI report uses the descriptors "mild" and "moderate," R. 384, the ALJ did not discuss Dr. Prevost's "MRI Follow-up Lumbar" visit with Mr. Bullock. *See* R. 386–87. Dr. Prevost wrote that he reviewed the MRI scan "which shows fairly severe degenerative changes all the way up and down his lumbar spine [and] his postsurgical changes at L4-5[. H]e does have some mild narrowing at L4-5 and L5-S1 stenosis and significant endplate signal changes at multiple levels throughout the lumbar spine. Fairly severe spondylosis for his age." R. 387. Dr. Prevost listed "Lumbar stenosis spondylosis" as the diagnosis, did not recommend "any more surgery," and instead recommended pain management. R. 387.

With respect to Mr. Bullock's "long history of arthritis in the knees," the ALJ focused on Mr. Bullock's results and recoveries from multiple knee surgeries and

mentioned an examination that "showed a normal gait and full range of motion at the right knee, despite some crepitation and pain." R. 21 (citations omitted). But, the medical records cited for this proposition were from a January 10, 2018 visit to Dr. Dyas. R. 394. Yet, the medical records between the date of onset of disability and the date of last insured are unequivocal and consistent in their description of Mr. Bullock's gait as antalgic. *See* R. 463 (December 20, 2018); R. 467 (February 13, 2019); R. 471 (March 6, 2019); R. 476 (April 10, 2019); R. 480 (May 31, 2019).

The ALJ also mentioned positive straight leg raising, 10-degree flexion contracture of the left knee with positive hyperflexion text and effusion, crepitation, pain, effusion, and osteoarthritis of the knees. R. 21–22. After citing this evidence, though, the ALJ stated that "examinations during the period at issue consistently showed normal motor function, reflexes, and sensation" and Mr. Bullock was "doing well with his pain management regimen" without explaining why these examination results or chronic pain management regimen indicate that Mr. Bullock's impairments were not as severe as he asserted. R. 22. In fact, the ALJ failed to mention that in the same medical records where Dr. Dyas reported normal motor function, reflexes, and sensation, he also wrote that Mr. Bullock "continues to have pain, impairment[,] muscle spasm[,] and stiffness" and "pain at rest." R. 463.

Additionally, despite a pain management regimen that included opiates and injections, Dr. Dyas's medical records indicate that Mr. Bullock "continues to suffer

from chronic pain[ with] pain generators well documented in the chart." R. 467. *See, e.g.,* R. 461 ("left knee pain with left knee arthralgia, left knee chondromalacia patella"); R. 465 ("bilateral knee pain"); R. 472 ("He has severe pain behavior associated with manipulation of the patella associated with crepitation of the patella.").

Finally, the court agrees with Mr. Bullock that the ALJ's discussion of his daily activities is not an accurate statement of the record. *See* Doc. 13 at 17. The ALJ stated that "on May 31, 2019, [Mr. Bullock] reported that he was bailing hay and using a tractor." R. 22. In fact, the March 6, 2019 records state that though Mr. Bullock "initially did well" following arthroscopic surgery, "he had a flare up so that he can not even push the clutch on his tractor." R. 471. On May 31, 2019, the records state that Mr. Bullock "reports that his lower back and both his knees continue to really bother him. He was bailing hay and states that just pushing the pedals on his tractor is painful for his knees and lower back." R. 478. Additionally, the August 1, 2019 arthroscopy report states that Mr. Bullock "has pain working with his clutch on his tractor," "getting up and down stairs," and "getting in and out of a car." R. 487. The ALJ did not explain why pain while attempting a seated activity such as operating a clutch on a tractor supports a residual functional capacity to perform a light level of work with carrying and standing requirements.

As the Eleventh Circuit stated in *McCruter*, "[i]t is not enough to discover a piece of evidence which supports th[e] decision" – here certain normal examination findings, chronic pain management, and attempting to operate a clutch on a tractor – "but to disregard other contrary evidence." 791 F.2d at 1548. "The review must take into account and evaluate the record as a whole." *Id*. Having carefully reviewed the record as a whole and the rationale provided by the ALJ, the court concludes that substantial evidence does not support the ALJ's decision based on the rationale provided. *See Winschel*, 631 F.3d at 1179.

Mr. Bullock also argues that the ALJ erred in her evaluation of the opinion of state agency physicians and Mr. Bullock's need for rest breaks and the vocational expert testimony. Doc. 13 at 14, 18. Because the court is remanding the case on the basis of the errors discussed above, the court does not reach the other issues raised by Mr. Bullock.

## VI.   Conclusion

The ALJ's determination that Mr. Bullock is not disabled is not supported by substantial evidence. The Commissioner's final decision is therefore reversed and remanded to the Commissioner to conduct further proceedings consistent with this opinion. A separate order will be entered.

**DONE** and **ORDERED** this 21st day of September, 2023.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE